C. G. ANDERSON V. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CLOUD.

No. 15,641.   (95 Pac. 583.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Legislative Powers—General or Special Law—Applicability a Judicial Question.* Section 17 of article 2 of the constitution as amended in 1906 (Laws 1905, ch. 543) takes from the legislature the right to determine finally when a general law can be made applicable, and devolves upon the courts the duty to determine it as a judicial question, without regard to any legislative assertion on the subject.

46—77 KAN.

2. ―――― *Statutory Construction.* Where the validity of an act is assailed under section 17 of article 2, as amended, the rule of statutory construction which makes it the duty of the courts to uphold a law if it is possible to do so has no·application.

3. ―――― *Special Act Invalid.* Chapter 72 of the Laws of 1907, providing for the erection and removal of bridges across the Republican river in Cloud county and authorizing the board of county commissioners of that county to issue bonds to meet the expense thereof, is repugnant to section 17 of article 2 of the constitution, and therefore void.

Error from Cloud district court; WILLIAM T. DILLON, judge. Opinion filed April 11, 1908. Reversed.

*B. T. Bullen, W. D. Vance,* and *Hugh Alexander,* for plaintiff in error.

*Fred W. Sturges, jr.,* county attorney, for defendant in error.

The opinion of the court was delivered by

PORTER, J.: In April, 1907, the board of county commissioners of Cloud county appropriated the sum of $8000 for the purpose of removing and rebuilding a bridge across the Republican river, and afterward proceeded to let the work by contract to the Western Bridge and Construction Company. The plaintiff, who is the owner of a 640-acre farm in Cloud county, brought suit to enjoin the proceedings. The court refused to grant a temporary injunction, and the plaintiff brings the case here for review.

The facts are not disputed. The bridge in question is located upon a regularly established road, which leads north from the city of Concordia across the Republican river. The road is known as the "McCrary road," and crosses the plaintiff's farm. That portion of·plaintiff's land where his buildings are located is an island, by reason of there being a branch of the Republican river south of his improvements which has its upper opening in the river above the bridge and connects again with the river below. The bridge therefore furnishes the

only means of getting to and from that portion of his farm on which his improvements are located. It is alleged that its removal would cause irreparable injury to the plaintiff. The bridge was built in 1903, at a cost of $10,000. In the opinion of the board there is a necessity for its removal, on account of a change in the channel of the river, which has left it practically useless. The question of removing it and of appropriating money and issuing bonds to pay for the expense has never been submitted at any election to the voters of the county.

It is admitted that the board · is without power or authority in the premises except as conferred upon it by chapter 72 of the Laws of 1907, for the reason that the expense of removing the bridge and building a new one will exceed the sum which the board is allowed to appropriate for such purposes without a vote of the people; that it is the intention of the board to remove the bridge to another road across the river a mile west of its present location; and that for the purpose of meeting the expense thereof the commissioners intend to issue and sell the bonds of the county without submitting the proposition to the voters of the county at an election.

The sole contention is that the act of the legislature under which the board is proceeding is unconstitutional. The title of the act reads as follows:

"An act to provide for the erection and maintenance of a bridge, and removal of a bridge, or bridges, across the Republican river, in the vicinity of Concordia, Cloud county, Kansas, and to authorize the board of county commissioners of said county to issue bonds to provide funds for payment of the same."

The first section provides:

"That the board of county commissioners of Cloud county, Kansas, be and are hereby authorized and empowered, in their discretion, to erect and maintain such bridge or bridges for the use of the public across the Republican river and its various channels and cut-offs in the vicinity of the city of Concordia, Cloud county,

Kansas, at such points as may be by said board of county commissioners selected; and to remove and relocate any bridge heretofore or hereafter erected by said county and which, by reason of changes in the channel of said river, has, in the opinion of said board, become useless to the general public." (Laws 1907, ch. 72, § 1.)

Section 2 empowers the board to issue the bonds of the county in such amount as may be necessary to meet the expense of such removal and erection, not exceeding the total amount of $15,000. Section 3 provides that the bonds shall not be sold for less than par, and authorizes the registry of the bonds and provides for their payment and cancelation. Section 4 authorizes the county commissioners to levy a tax annually to pay the interest on the bonds and create a sinking-fund for their final redemption. Section 5 provides that none of the restrictions in any former statute shall apply to or in any way affect the issuance of bonds under this act.

The ground upon which the validity of the act is assailed is that it is a special act, and for that reason repugnant to the second clause of section 17 of article 2 of the constitution. By its express terms the act is special and applies to Cloud county alone. From 1859, when the constitution was adopted, until the amendment of 1906 the language of section 17 of article 2 read as follows:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted." (Gen. Stat. 1901, § 135.)

In the early case of *State of Kansas ex rel. Johnson v. Hitchcock,* 1 Kan. 178, 81 Am. Dec. 503, this provision was construed and the rule declared that it was for the legislature to determine whether its purposes could or could not be expediently accomplished by a general law. That rule has never been departed from by the court in construing the second clause of the fore-

going provision. (*Rambo v. Larrabee,* 67 Kan. 634, 73 Pac. 915, and cases cited.) This constitutional limitation is based upon the theory that the state is a unit, to be governed throughout its length and breadth on all subjects of common interest by the same laws, and that these laws should be general in their application and uniform in their operation. When it was adopted the evil effects of special legislation enacted at the behest of private individuals or local communities were well understood and appreciated. The makers of the constitution were confronted with the experience of the older states, which had demonstrated that legislatures were wholly unable to withstand the constant demands for private grants of power and special privilege. The same year that our constitution was adopted the conditions in Illinois had reached such a stage that, in the language of the supreme court, the mischiefs of special legislation were "beyond recovery or remedy." (*Johnson v. Joliet and Chicago Railroad Company,* 23 Ill. 202, 207.) In the case just cited Mr. Justice Breese said:

"It is too late now to make this objection, since, by the action of the general assembly under this clause, special acts have been so long the order of the day, and the ruling passion with every legislature which has convened under the constitution, until their acts of this description fill a huge and misshapen volume, and important and valuable rights [are] claimed under them. The clause has been wholly disregarded, and it would now produce far-spread ruin to declare such acts unconstitutional and void." (Page 207.)

From time to time, in opinions written upon the subject, members of this court have expressed their individual dissent to the doctrine that the courts were bound by the legislative determination. In *Elevator Co. v. Stewart,* 50 Kan. 378, 32 Pac. 33, Mr. Justice Valentine said:

"It can make but very little difference what might be the views of the individual members of this court, as the court is now constituted, if the questions now pre-

sented by counsel were original questions presented to them for the first time now; for we think they have all been heretofore settled by numerous prior decisions of this court." (Page 382.)

Mr. Justice Johnston, in the case of *Eichholtz v. Martin*, 53 Kan. 486, 36 Pac. 1064, used this language:

"The old question so often raised is again presented: Was it competent for the legislature to determine whether a general law could be made applicable, and whether a special law was necessary? If the question were a new one, the writer of this opinion would be inclined to the view that the courts should determine in each such case whether this constitutional restriction had been violated or not; but the question has been put at rest by a long series of decisions holding that the decision of the question is exclusively for the legislature, and not for the courts." (Page 488.)

And in the same opinion the possibility of the adoption of an amendment was thus foreshadowed:

"From the multiplicity of special acts recently enacted, it appears that the constitutional limitation has little force; but, in view of the length of time that the rule has been established and followed, we are all of the opinion that the question should be regarded as settled until the people shall change the constitution, and declare that the decision of the lawmaking power in respect to the necessity for special laws is subject to judicial review." (Page 488.)

As early as 1854 the same question which was presented to this court in *State of Kansas ex rel. Johnson v. Hitchcock*, 1 Kan. 178, was before the supreme court of Indiana, and exactly the opposite construction was placed upon their constitution. In the opinion in *Thomas v. The Board of Commissioners, &c.*, 5 Ind. 4, it was said:

"It is, however, insisted that the legislature have decided a general law to be applicable to the case under consideration; that from this decision there is no appeal; and that, therefore, it is not competent for this court to decide upon the validity of the law in question. If that position be correct, the twenty-third section has

Anderson v. Cloud County.

no vitality; nor is there any reason why it should have a place in the constitution. It would impose no restriction upon the action of the legislature, nor confer any power which that body would not possess. in the absence of such a provision. If that section permits the legislature to enact a special or local law *ad libitum,* in any case not enumerated, the principle involved would deprive this court of all authority to call in question the correctness of a legislative construction or its own powers under the constitution.

"We are not prepared to sanction this doctrine. The maxim 'that parliament is omnipotent' has no place in *American* jurisprudence. Whether the legislature have, in the case at bar, acted within the scope of their authority, is, in our opinion, a proper subject of judicial inquiry." (Page 7.)

The Indiana court, however, receded from this position, and, in 1868, the decision in the case quoted from was expressly overruled in *Gentile v. The State,* 29 Ind. 409.

In 1878 the supreme court of New Jersey, construing a similar constitutional provision, declined to adopt the construction that the determination of the legislature to the effect that a general law could not be made applicable was binding upon the courts, and in the case of *Pell v. Newark,* 40 N. J. Law, 71, 29 Am. Rep. 266, used this language:

"It cannot be adopted by the courts without abandoning one of the most important branches of jurisdiction committed to them by the constitution. That the legislature would act in good faith, must be presumed; purity of motive and a desire to keep within the prescribed limitations must be conceded to its members at all times; but that the people should have deliberately framed and imbedded in their organic law an amendment to prohibit special legislation where general laws might be passed, and, at the same time, should have intended to put legislative action beyond review, where there was a clear infraction of the prohibition, is a proposition to which it seems impossible to assent. The mere form in which a law is enacted cannot be conclusive of the question." (Page 81.)

The foregoing quotations indicate some of the many reasons that might have been urged in support of the other theory of constitutional construction if this court had seen fit to adopt that theory when the case of *State of Kansas ex rel. Johnson v. Hitchcock, supra,* was before it. More than one-half of the states of the Union have sought to curb the growing evils of special legislation by constitutional prohibitions. And the courts in construing provisions similar in language to our section 17 of article 2 as it read before the recent amendment have almost uniformly held it to be the province solely of the legislature to determine when a general law can be made applicable. Whether the rule adopted in *State of Kansas ex rel. Johnson v. Hitchcock* was sanctioned by the better reason, it undoubtedly was supported by the weight of authority. In many of the states the constitutional limitation is coupled with a specific enumeration of subjects with respect to which special laws are expressly forbidden. This is true of the constitutions of all of the newer states, and the same plan has been adopted in some of the older states by amendment. In New York the constitution enumerates thirteen subjects upon which the legislature is forbidden to pass a private or local bill. The constitution of the state of Washington prohibits special legislation upon eighteen subjects; that of North Dakota expressly names thirty-five, and in addition thereto the constitution reads (art. 2, § 70) :

"In all other cases where a general law can be made applicable, no special law shall be enacted; nor shall the legislative assembly indirectly enact such special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed."

The constitution of Missouri was amended in 1875, and enumerates thirty-two subjects upon which special laws are prohibited, among which are the following:

"Regulating the affairs of counties, cities, townships, wards or school districts; changing the names of persons or places; changing the venue in civil or criminal cases; authorizing the laying out, opening, altering or

maintaining roads, highways, streets or alleys; relating to•ferries or bridges;  .  .  .   vacating roads, town plats, streets or alleys;  .  .  . authorizing the adoption or legitimation of children; locating or changing county seats; incorporating cities, towns or villages, or changing their charters;  .  .  . granting divorces; erecting new townships, or changing township lines, or the lines of school districts; creating offices, or prescribing the powers and duties of officers in counties, cities, townships, election or school districts; changing the law of descent or succession; regulating the practice or jurisdiction of, or changing the rules of evidence in, any judicial proceeding;  .  .  . regulating the management of public schools, the building or repairing of school-houses, and the raising of money for such purposes; fixing the rate of interest; affecting the estates of minors or persons under disability;  .  .  . regulating labor, trade, mining or manufacturing; creating corporations, or amending, renewing, extending or explaining the charter thereof; granting to any corporation, association or individual any special or exclusive right, privilege or immunity, or to any corporation, association or individual the right to lay down a railroad track; declaring any named person of age;  .  .  . giving effect to informal or invalid wills or deeds;  .  .  . legalizing the unauthorized or invalid acts of any officer or agent of the state, or of any county or municipality thereof." (Const. Mo., art. 4, § 53.)

In addition there is the following general limitation:

"In all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject." (Const. Mo., art. 4, § 53.)

Minnesota amended her constitution in 1892, and special laws upon fifteen subjects are prohibited, and there is also a general limitation (Const. Minn., art. 4, § 33) couched in the identical language just quoted from the constitution of Missouri. The experience of those states which have attempted thus to solve the problem has demonstrated that it is impossible to anticipate the

various subjects upon which this kind of legislation will be demanded. The fact that the people have not attempted in our constitution to enumerate any of the specific subjects upon which the legislature shall not pass special laws has the effect necessarily to expand rather than to limit· the scope of the provision as it reads.

The inherent vice of special laws is that they create preferences and establish irregularities. As an inevitable consequence their enactment leads to improvident and ill-considered legislation. The members whose particular constituents are not affected by a proposed special law become indifferent to its passage. It is customary, on the plea of legislative courtesy, not to interfere with the local bill of another member; and members are elected and reëlected on account of their proficiency in procuring for their respective districts special privileges in the way of local or special laws. The time which the legislature would otherwise devote to the consideration of measures of public importance is frittered away in the granting of special favors to private or corporate interests or to local communities. Meanwhile, in place of a symmetrical body of statutory law on subjects of general and common interest to the whole people, we have a wilderness of special provisions whose operation extends no further than the boundaries of the particular school district or township or county to which they were made to apply. For performing the same services the sheriff or register of deeds or probate judge of one county receives an entirely different compensation from that received by the same officer of another county. The people of one community of the state are governed as to many subjects by laws wholly different from those which apply to other localities. Worse still, rights and privileges which should only result from the decree of a court of competent jurisdiction, after a full hearing and notice to all parties in interest, are conferred upon individuals and private corporations

by special acts of the legislature without any pretense of investigation as to the merits or of notice to adverse parties. Commenting upon the evils of special legislation, Mr. Samuel P. Orth, in the *Atlantic Monthly* for January, 1906, used this language:

"The Romans recognized the distinction between private bills and laws. To them, special laws were *privilegia* or *constitutionis privilegia*. In England they used to say when a public bill was passed: *Le roi le veult,*— it is the king's wish; and of a private measure: *Soit fait comme il est désiré,*—let it be granted as prayed for.

"Here is the gist of the matter: a public law is a measure that affects the welfare of the state as a unit; a private law is one that provides an exception to the public rule. The one is an answer to a public need, the other an answer to a private prayer. When it acts upon a public bill, a legislature legislates; when it acts upon a private bill, it adjudicates. It passes from the function of a lawmaker to that of a judge. It is transformed from a tribune of the people into a justice shop for the seeker after special privilege." (Page 69.)

It has been estimated that fully one-half of the laws enacted by the state legislatures in recent years have been special laws. Since 1859 the rapid growth of cities and towns has produced so many changes in social and economic conditions, and added so much to the complex necessities of local communities, that the demand upon legislatures for this species of class legislation has increased and the evil effects have multiplied. The legislature of 1905, which differed in this respect but little from its predecessors, passed no less than twenty-five special acts relating to bridges, and thirty-five fixing the fees of officers in various counties and cities. Out of a total of 527 chapters, more than half are special acts. This does not include appropriation laws, which from their nature are inherently special. The first act passed by this legislature declared a certain young woman the adopted child and heir at law of certain persons. Others changed the names of individuals. Many granted valuable rights and privileges to private cor-

porations. Hundreds granted special favors to municipal corporations, and many others conferred special privileges upon individuals. Such were the conditions which induced the people at the general election in 1906 to change the constitution by adopting the amendment to section 17 of article 2. The amendment was submitted by the legislature of 1905 (Laws 1905, ch. 543, § 1) and reads as follows, the amendatory part being italicized:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable no special law shall be enacted; *and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state.*"

The only change is to require the courts to determine, as a judicial question, whether in a given case this provision has been complied with by the legislature. The amendment adds nothing to the mandatory character of the provision. As it read originally it was mandatory, and the validity of every law enacted by the legislature since the adoption of the constitution may be said to have depended upon a strict compliance with it. Under the construction adopted by the court, however, the way was open for the legislature to disregard both the spirit and the letter of the provision, and, as we have attempted to show, both have been honored more in the breach than in the observance. It is apparent that had this section as originally adopted provided that the courts should determine the question, or had a different rule of construction been adopted by the court, many laws must necessarily have been declared invalid because repugnant to the provision.

Constitutions are the work, not of legislatures or of the courts, but of the people. The people give, and the people take away, constitutional provisions. The adoption of the amendment must be regarded as the sober, second thought of the people upon the subject, and as an emphatic declaration of their determination to strike at

the root of the evil and to rely upon the vigilance of the courts to restrain the action of the legislature in the future.   The legislature no longer has the power of finally determining either that a proposed law will have uniform operation throughout the state or that a local condition exists which requires a special law.   A cursory glance through the bulky volume of the Session Laws of the legislature of 1907 indicates that the adoption of the amendment has not served any good purpose unless the action of the courts shall give to it the effect which the people intended.

As observed, the provision has not been altered except to take from the legislature and give to the courts the final determination of the question whether a given act of the legislature is repugnant to its terms; it still recognizes the necessity for some special legislation; it is still a limitation and not a prohibition.   Without some special laws state governments could not exist. An appropriation law, however general in its terms, is necessarily special.   A law changing the boundaries of a judicial district is a special law, but one which may be required at any time, and to enact a general law upon the subject might accomplish more evil than good. Again, conditions sometimes arise and emergencies are created which require the enactment of special legislation.   The mere mention of the subject in the constitution is a recognition of this necessity.

What is the attitude which the courts must take in respect to this subject since the amendment?   In the quotations from the Missouri and Minnesota amendments, *supra,* it will be observed that they provide that the question "shall be judicially determined without regard to any legislative assertion on that subject," but without the addition of these words the attitude of the courts in our opinion must be the same.   It will be the duty of the courts to determine the question without reference to anything the legislature has declared, either in the act in question or in other acts.

It is obvious that the amendment has the effect to destroy the force of some of the former decisions of this court as precedents. The general canon of statutory construction which makes it the duty of courts to uphold the validity of a law if it is possible to do so can have no application in the future where an act is assailed as repugnant to this provision, however much that principle may apply to objections falling under other provisions of the constitution.

The constitution expressly forbids special laws where a general law can be made to apply. When a special law is passed, therefore, the legislature necessarily determines in the first instance that a general law cannot be made to apply. But their determination is not final. There is, of course, a presumption that public officers have discharged their duties properly, and every act of the legislature is presumed to be valid until there is a judicial determination to the contrary. But when a special law has been enacted and its validity is assailed in the courts the question is to be finally determined by the courts as a judicial question, uncontrolled by the determination of the legislature. The courts must determine the question as other purely judicial questions are determined, by reference to the nature of the subject; not upon proof of facts or conditions, but upon the theory that judicial notice supplies the proof of what courts are bound to know, and that courts must be aware of those things which are within the common knowledge, observation and experience of men generally.

The first clause of this section of the constitution involves the question of classification, which it is apparent does not enter into the present case. Here there will doubtless remain in the future an ample field upon which lawyers may contend and courts and judges differ. It may be said in passing, however, that it will be the duty of the courts, when that question arises, to apply the established tests to determine whether an attempted classification by the legislature is a proper one,

based upon some apparently natural reason suggested by necessity and occasioned by a real difference in the situation and circumstances of the class to which it applies, or whether it is arbitrary or capricious and excludes from its provisions some persons, localities or things to which it would naturally apply except for its own limitations. It may be said, however, that it will not become the duty of the courts to invent reasons for upholding a law which is repugnant to either clause of this provision.

It requires no argument or discussion to demonstrate that the special act in question violates the constitution. To enact a general law on the subject, giving to boards of county commissioners in every county in the state authority to build or remove bridges, appropriate funds and issue bonds to meet the expense thereof under such restrictions and limitations upon their authority in the premises as the legislature may deem wise and salutary, would not require more than ordinary skill in the science of legislation.

We are not concluded either way by the fact that a general law on the subject was in existence when a special act was passed. That fact, however, serves as an apt illustration of the adaptability of a general law upon the subject, and as an argument against the necessity for a special law. It is argued that the local conditions in Cloud county are such as to authorize an exception to be made and to require this special act. It appears that the bridge which the board was intending to remove was built in the first place by authority of a special law enacted in 1903 (Laws 1903, ch. 102) ; that the claims for a special law at that time were that the river had abandoned its channel and left a former bridge useless. Everybody knows that the rivers of the Missouri valley frequently change their course and create conditions similar to those which existed in Cloud county in 1906. The experience of Cloud county in this respect differs from that of many other counties in the state, if at all, only in the extent to which that

county has suffered. From twenty-five to thirty special laws of this nature have been passed by almost every legislature for years, and practically the same reasons urged for their enactment. No reason can be suggested why a general law upon the subject could not be made to apply, with a uniform operation throughout the state, wherever similar conditions are likely to arise. In fact, the only suggestion made as to why the general law already in existence authorizing the erection of bridges is not sufficient to meet the conditions is that in the opinion of the members of the board the voters would defeat any proposition submitted. This amounts to a confession that in the act in question there inhere the vices which the amendment was designed to prevent. To hold that the reasons suggested are sufficient to warrant a special law would raise again the lid of Pandora's box only to permit its evils to escape. It follows, therefore, that the act must be declared void.

The judgment is reversed and the cause remanded for further proceedings.